IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

**IN ADMIRALTY**

| | |
|---|---|
| The United States of America, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | Civil Action No. |
| ) | 05-cv- |
| ERIK J. TAKAKJIAN, STEVE GATTO, TOM PACKER, ) | |
| TOM MURRAY, DAVE MORTON, STEVE SCHEUER, ) | |
| and the BOSTON SEA ROVERS, *in personam*, and the ) | |
| RESEARCH VESSEL (R/V) QUEST, her engines, ) | |
| anchors, tackle, and appurtenances, etc., *in rem*, ) | |
| ) | |
| Defendants. ) | |

05 10397 RWZ

**MEMORANDUM IN SUPPORT OF THE UNITED STATES' MOTION
FOR ISSUANCE OF AN INJUNCTION**

Plaintiff United States submits this Memorandum in support of its Motion for a Preliminary Injunction and Temporary Restraining Order. Also attached are a Verified Complaint (Attachment 1) ["Complaint"] and the Declaration of CDR Steven M. Stancliff, USCG (Attachment 2) ["Declaration"].

### BACKGROUND

The Lightship NANTUCKET (LV-117) was built for and operated by the United States Lighthouse Service[1] as a floating beacon. Her station was roughly 50 miles south of the Island of Nantucket and 200 miles east of New York City. On or about May 15, 1934,

---

[1] The U.S. Lighthouse Service was since enfolded into the U.S. Coast Guard.

the NANTUCKET (LV 117) was rammed then sank with four of its crew still aboard. The Coast Guard was unable to retrieve their remains and considers the wreck a grave site. Although the Coast Guard decommissioned the NANTUCKET (LV-117), it has never abandoned the vessel. Thus, NANTUCKET (LV-117) remains property of the United States under the custody of the Coast Guard, in care of its Office of Financial Management, Asset Management Division.

On March 1, 1999, Defendant Takakjian contacted the Massachusetts Board of Underwater Archeological Resources (BUAR) with respect to his interest in retrieving items from the NANTUCKET (LV-117). BUAR documented that discussion with a letter to Takakjian expressly noting that NANTUCKET (LV-117) was *federal* property under the control of the *Coast Guard*. BUAR specifically advised Takakjian that such a project could be undertaken:

- only with the consent and cooperation of the United States Coast Guard;
- that all recovered materials will remain the property of the Coast Guard; and
- that all recovered material would be turned over to the Coast Guard.

BUAR informed the Coast Guard of Takakjian's request by sending copies of its letter to the Coast Guard Historian, Robert Browning, and the curator of the Coast Guard Museum, Cindee Herrick.[2]

Within days of his conversation with the Massachusetts BUAR, Takakjian wrote to the Coast Guard's Chief Counsel on March 5, 1999, with copies to historian

---

[2] *See*, Exhibit A to the Declaration and Complaint.

Robert Browning and curator Cindee Herrick. Takakjian explained that he had located the wreck of the Lightship NANTUCKET (LV-117). He *requested permission* to "recover the ship's fog bell, conserve, and stabilize it" and deliver it to the Coast Guard Museum at the Coast Guard Academy in New London, Connecticut. Takakjian concluded his request by stating, "**I await the approval of your office, Mr. Browning and Ms. Herrick before proceeding further with this project.**"[3]

The following month, by direction of the Commandant of the U.S. Coast Guard, the Acting Chief of the Coast Guard's Office of Environmental Law wrote back to Takakjian to inform him that:

- the Coast Guard's Office of Financial Management, as custodian of the decommissioned vessel, would decide the matter;
- the remains of crew members of the NANTUCKET (LV-117) are believed to still be aboard the vessel; and
- historical preservation issues were involved; so,
- Federal law required the Coast Guard to engage in multi-agency coordination before reaching a decision on Takakjian's request; but,
- Takakjian could expedite the review process by submitting evidence of his professional expertise and details of his salvage plan.[4]

That response also identified specific points of contact at the Office of Financial Management and invited Takakjian to contact the Coast Guard's legal staff if he had further questions. But Takakjian did not contact the Coast Guard's Office of Financial Management or make inquiries of the legal staff.

---

[3] *See*, Exhibit B to the Declaration and Complaint (emphasis added).

[4] *See*, Exhibit C to the Declaration and Complaint.

By direction of the Commandant, the Chief of the Coast Guard's Asset Management Division *answered* Takakjian's request on June 28, 1999. That response:

- referred directly to Takakjian's request of March 5, 1999;
- confirmed that the U.S. Coast Guard is the owner and custodian of the NANTUCKET (LV-117);
- confirmed that under Federal criteria for historic property, significant consultation and evaluation were required prior to going forward;
- because the shipwreck is a grave site, there were significant issues of privacy;
- and as a result, the Coast Guard informed Takakjian, "**you may not undertake any activities involving the NANTUCKET.**"[5]

Although that denial letter provided Takakjian a point of contact, he did not disagree with, complain about, or appeal the decision rendered on June 28, 1999.

Five years later, in September 2004, the founder of the USCG Lightship Sailors Association, Inc., alerted the Coast Guard that the Boston Sea Rovers[6] had removed artifacts from the NANTUCKET (LV-117).[7] The Boston Sea Rovers issued a press release claiming to have taken the following items from NANTUCKET (LV-117):

- the ship's bell
- its helm
- its engine order telegraph
- its binnacle

---

[5] *See*, Exhibit D to the Declaration and Complaint (emphasis added).

[6] The Boston Sea Rovers describe themselves as "a group of divers dedicated to raising the level of knowledge of the underwater world." Exhibit E to the Declaration and Complaint. The Boston Sea Rovers claim that they "authorized" the removal of artifacts from the NANTUCKET (LV-117). Id. They maintain an Internet website at: http://www.bostonsearovers.com.

[7] *See*, Exhibit E to the Declaration and Complaint (The reporting source stated, "Projects like this should never happen. From a very personal standpoint, these people are desecrating a grave site of my brother Lightship Sailors who died with honor.").

4

- its signal light, and
- several portholes[8]

Boston Sea Rovers' press release discusses how Defendants Takakjian, Gatto, Packer, Murray, Morton and Scheuer used force "to finally break the bell and it's (sic) support legs free from the wreckage" and how they cut off the bell's support structure to make it easier to bring aboard R/V QUEST.[9] The press release made no mention of returning that Federal property to the United States, but instead boasted about placing it on public display.[10]

Once informed that Defendant Takakjian had ignored the Coast Guard's instructions to refrain from undertaking any activities involving the NANTUCKET (LV-117), Coast Guard investigators contacted Takakjian. He admitted that he had received the Coast Guard's denial of his request to dive on the NANTUCKET (LV-117) to retrieve its bell. He further admitted that in addition to those items listed above, he had also removed the Lightship's main lantern and a clock case. While Defendant Takakjian stated that he intended to put the items taken from NANTUCKET (LV-117) on public display, he maintained the ship's bell and binnacle on his own property. Takakjian also transferred the ship's main lantern, helm, and engine order telegraph to Defendants Packer and Gatto, who live in New Jersey.

---

[8] Id.

[9] Id.

[10] Id.

On November 23, 2004, Defendant Takakjian told Coast Guard investigators that he and his colleagues would return the property taken from NANTUCKET (LV-117). Having received Takakjian's pledge to promptly return that property, the United States Attorney for the District of Massachusetts declined to prosecute Takakjian for "stealing federal government property."[11]  However, Defendants **never** returned the artifacts, which are worth tens of thousands of dollars and have historical significance as well.

## SUMMARY OF ARGUMENT

This action is in the nature of replevin, because it seeks return of property of the United States to the United States. The removed artifacts are in the possession and control of the Defendants. The possibility of a meaningful decision on the merits is severely diminished or eliminated unless the Defendants are compelled to deposit the NANTUCKET's artifacts in the possession of this Court. The property is not fungible. It is historical and carries a poignant reminder of heroes past who risked and gave their lives so that others could be safe on the high seas. A Preliminary Injunction or Temporary Restraining Order is appropriate in this situation to protect the remedy of return of the United States' property.

This Court has admiralty jurisdiction over the Defendants. It has power to issue the requested injunctive relief, which is necessary to protect the remedy and ensure that a meaningful decision on the merits is ultimately rendered. A & R Marine Salvage, Inc. v.

---

[11] *See*, Exhibit F to the Declaration and Complaint.

McAllister Lighterage Line, Inc., 544 F.2d 551, 554 (1st Cir. 1976) (District Court empowered to issue a preliminary injunction requiring salvor to release property to owner upon owner's demand for its return); *see also*, 28 U.S.C. § 2284(3). The prerequisite conditions for issuing an injunction are satisfied: if not granted, the United States' damages would be irreparable; there is no risk of identifiable damage to Takakjian and his colleagues if the Preliminary Injunction is granted; a substantial likelihood exists that the United States will prevail on the merits; and granting the requested relief is unmistakably in the public interest.

## ARGUMENT

I.   INJUNCTIVE RELIEF IS AUTHORIZED AND APPROPRIATE

This Honorable Court has power to grant an injunction, which is appropriate because the intermediate relief is the same as the ultimate relief. De Beers Consolidated Mines, Ltd., *et al.* v. United States, 325 U.S. 212, 220 (1945). This court has the inherent power to exercise all appropriate powers required for the performance of its duties. Ex parte Peterson, 253 U.S. 300, 312-14 (1920). Those inherent powers include injunction power "to process litigation to a just and equitable conclusion." Aoude v. Mobil Oil. Corp., 892 F.2d 1115, 1118 (1st Cir. 1989) (internal citations omitted). The NANTUCKET (LV-117) artifacts *are* the subject of this action and not merely some byproduct of other relief sought. The Court may act to preserve the *res* to ensure an equitable conclusion is attained Thus, this Court should order the Defendants to either deposit the NANTUCKET artifacts

with the Court or to return them to the United States, pending a determination on the merits.

This Circuit recognizes four elements necessary for issuance of the injunction requested. Keds Corp. v. Renee International Trading Corp., 888 F.2d 215, 220 (1st Cir. 1989). *See also,* Planned Parenthood League of Massachusetts v. Bellotti, 641 F.2d 1006, 1009 (1st Cir. 1981). They are: (1) irreparable injury will be suffered unless the injunction is issued, (2) threatened injury to the movant outweighs any damage the injunction may cause the opponent, (3) the movant has a substantial likelihood of eventual success on the merits, and (4) the injunction would not be adverse to the public interest.

(1) Irreparable Injury

The most compelling reason for entry of injunctive relief under Fed. R. Civ. P. 65, both for an injunction under Rule 65(a), and a Temporary Restraining Order under Rule 65(b), is to prevent the judicial process from being rendered futile by Defendants' action or refusal to act. *See,* Wright & Miller & Kane, Federal Practice and Procedure, Civil 2d § 2947, at p. 123. Due to Defendants' established course of dealing with the United States and the nature of the artifacts taken from the wreck of the Lightship NANTUCKET (LV-117), it is certain that the United States will suffer irreparable injury if the requested relief is not granted.

Defendants' personal ambitions led them to run roughshod over the requirements of the National Historic Preservation Act ("NHPA").[12] Defendants' web site boasts of breaking artifacts free from NANTUCKET (LV-117) and cutting off structural support members that they found inconvenient. A salvor's failure to preserve "archaeological provenience" while removing artifacts is grounds to deny any award of salvage. *See, e.g.*, Klein v. Unidentified Wrecked and Abandoned Sailing Vessel, 758 F.2d 1511, 1515 (11th Cir. 1985) ("A contrary result would encourage persons to enter [Federal property] and to continue the unauthorized removal of articles. . . ."). Defendants have already distributed historical artifacts among themselves and keep them on (and as) their personal property. To ensure no further harm comes to these artifacts, or to the wreck of the Lightship NANTUCKET (LV-117), or to the maritime grave site of four sailors who went down with that ship, the United States seeks both a Preliminary Injunction and a Temporary Restraining Order.

Defendants have already distributed some of the artifacts to other judicial districts, rather than placing them on display at the Coast Guard Museum as Takakjian said he would do. Without the protection of an Preliminary Injunction and Temporary Restraining Order, Defendants could continue to disburse the NANTUCKET (LV-117) artifacts beyond the reach of this Honorable Court and perhaps beyond the Coast Guard's ability to ever find them, again.

---

[12] *See, e.g.*, 16 U.S.C. § 470h-2 (establishing a Federal process for identifying, evaluating, nominating and protecting historic property).

Finally, Defendants treat the NANTUCKET (LV-117) artifacts not as historically significant articles so much as bargaining chips. Having completely ignored the Coast Guard's instructions to keep away from the wreck and grave site of the Lightship NANTUCKET (LV-117), Defendants then tried to force salvage on the Coast Guard – which they cannot do. New Bedford Marine Rescue, Inc. v. Cape Jeweler's Inc., 240 F.2upp.2d 101, 114 (D. Mass. 2003) ("[Owner] is correct in asserting that salvage services cannot be forced on an owner of a vessel.") (internal citations omitted). When confronted by Coast Guard investigators, Defendant Takakjian admitted that he was without authority to remove items from NANTUCKET (LV-117). Along with his colleagues, Takakjian pledged to return the items to their owner, as salvors are required to do. Adams v. Unione Mediterranea Di Sicurta, 220 F.3d 659, 675 (5th Cir. 2000) ("A salvor has an obligation to bring aided property to a safe place for the eventual return to the owner."). But Defendants **did not return** the items, and instead, they converted them for their own use. Id., 220 F.3d at 675 ("A salvor may not keep the salved property and, if she did so, would become liable for conversion. Benedict on Admiralty § 157 at 11-3.").

Defendants *continue* to hold NANTUCKET's historic artifacts hostage in an effort to dictate *where, when, and how* the United States must display them. Worse still, Defendants hold the NANTUCKET artifacts hostage as leverage by which to claim "a liberal salvage award." But, as the courts have noted, when salvors act in bad faith, they forfeit any claim to an award. Id., 220 F.3d at 676. ("[T]he law cannot tolerate salvors' dishonesty,

corruption, fraud, [or] falsehood, either in rendering service, or in their proceedings to recover the salvage.") (internal citations omitted).

Due to the historic nature of these items and their linkage to the maritime casualty and underwater grave site at the wreck of the Lightship NANTUCKET (LV-117), the items are unique. Defendants boasted about forcibly breaking artifacts free and cutting off appendages that did not fit with their stowage or display plans. Defendants have *already* treated historic artifacts as personal property and shipped some out of this district. A Preliminary Injunction and temporary restraining order are needed to avoid *further* irreparable harm. Defendant's course of dealing with the U.S. Coast Guard and the NANTUCKET (LV-117) precludes the United States – or this Honorable Court – from simply trusting that Defendants will safeguard and return those artifacts once final judgment is rendered. Thus, the United States moves for a Preliminary Injunction and Temporary Restraining Order.

(2) <u>Irreparable Injury to Plaintiff Versus Potential for Damage to Defendants.</u>

The threat of ineffective (or wholly non-effective) remedy for the United States outweighs any potential damage that granting the Preliminary Injunction and Temporary Restraining Order may cause Defendants. If this Honorable Court issues the Preliminary Injunction and Temporary Restraining Order, Defendants will suffer <u>no</u> damage. This is true because Defendants *never* had title to the property they unlawfully removed from the NANTUCKET (LV-117) – a removal done against the express desires of the rightful owner of that property and custodian of that grave site. Once the Court renders its final judgment

in this matter, the artifacts unlawfully taken from NANTUCKET (LV-117) will be returned to the United States. Thus, the United States respectfully submits that if its Motion is granted, the only "harms" that could befall Defendants are two lessons learned sooner, rather than later: The first lesson is that one should not take Federal property without asking. The second lesson is that when one asks permission, the answer "no" means "no."[13]

In the extremely remote event that this Honorable Court were to grant possession of the NANTUCKET (LV-117) artifacts to Defendants, there would still be no harm to them in granting the instant Motion for Preliminary Injunction and Temporary Restraining Order. This is because when the artifacts are returned to the custody and control of the United States Coast Guard, they will be safeguarded, preserved, and maintained to museum standards. Thus, return of the items improperly taken from the wreck of the Lightship NANTUCKET (LV-117) to the Coast Guard could work no harm to the Defendants.

---

[13] This case is similar to that of International Aircraft Recovery, L.L.C., v. Unidentified, Wrecked and Abandoned Aircraft, 337 F.3d 1147 (11th Cir. 2004). In that case, a salvor located a wrecked United States WWII torpedo bomber and offered to sell a videotape of the aircraft with its coordinates to the Navy. Id., 337 F.2d at 1148. The Navy rejected the offer, indicating that any further attempts at salvage of the aircraft would be an unauthorized undertaking. Id., 337 F.2d at 1148-49. The salvor proceeded nonetheless, and afterwards sought an award for salvage. The trial court granted the United States' Motion for Summary Judgment in light of the 11th Circuit's earlier ruling in that same case that the United States, as owner, could lawfully prohibit salvage efforts on the wreck. Id., 337 F.2d at 1149 (citing 218 F.3d, 1255, 1256 (11th Cir. 2000)). The salvor appealed and the 11th Circuit affirmed, finding that the Navy's "effective rejection" of the offer of salvage precluded the salvor from taking any salvage award. Id., 337 F.2d at 1150. Here, because Defendants removed the NANTUCKET's artifacts *after* being told to keep away, they are likewise not entitled to any salvage award.

But as discussed above, failure to grant the United States' request for Preliminary Injunction and Temporary Restraining Order could result in Defendants making further alterations to historic artifacts, further distributing them to friends, secreting them outside this district, and continuing to use NANTUCKET's history as a bargaining chip. But if the United States prevails on the merits, then the NANTUCKET's artifacts were *never* the property of Defendants, and so they lose nothing. Performing the balancing test above, no harm comes to Defendants if the Motion is granted, but irreparable harm befalls the United States if it is not granted.

(3) <u>Substantial Likelihood of Success on the Merits.</u>

As the movant, the United States must meet its burden regarding the likelihood of success on the merits. <u>Renee International Trading Corp.</u>, 888 F.2d at 220. Where, as here, the other factors for relief are strong, the need to show likelihood of success on the merits is lessened commensurately. *See,* <u>Palmigiano v. Travisono</u>, 317 F. Supp. 776, 787 (D.R.I. 1970). But the United States' ownership of the NANTUCKET (LV-117) and its equipment is irrefutable. Defendants had actual notice of the fact that the Coast Guard still owned the wreck of the Lightship NANTUCKET (LV-117). Accordingly, Defendants cannot hope to meet their burden of demonstrating claimed abandonment by "clear and convincing evidence" that the United States "made an express declaration abandoning title." <u>Adams v. Unione Mediterranea Di Sicurta</u>, 220 F.3d 659, 671 (5th Cir. 2000). Thus, the United States would likely prevail on the merits *even if* a strong showing of ultimate success were required.

Defendant Takakjian, as operator of the R/V QUEST and on behalf of the Boston Sea Rovers, *requested permission* to dive on NANTUCKET to retrieve its bell. He had to request permission because he knew that the United States was and is the owner of the wreck, which is Federal property. That is why – six years ago – Takakjian promised the Coast Guard that he would await its decision before proceeding further. As the Massachusetts Board of Underwater Archeological Resources (BUAR) told Takakjian – again, six years ago – any recovery operations from NANTUCKET would have to be done with the consent of the Coast Guard and any recovered property would have to be returned to the Coast Guard. Likewise, the Coast Guard confirmed for Defendants – six years ago – that the NANTUCKET (LV-117) was Federal property. Finally, in the absence of further cooperation or detailed input from Takakjian, the Coast Guard determined that **no recovery** should be made from the NANTUCKET (LV-117) wreck and grave site. Rather than abide by that decision – six years ago – the Defendants spent the ensuing years raiding the wreck of the Lightship NANTUCKET (LV-117) and the underwater grave site of four of its crew.

Because Defendants' removal of NANTUCKET's artifacts – no matter how altruistic they may argue their intentions were – was without any authority whatsoever, the United States will prevail on the merits as to ownership of those items. *See, e.g.*, United States v. Steinmetz, 973 F.2d 212 (3d Cir. 1992), *cert. denied*, 507 U.S. 984 (1993) (determining bell taken from Confederate Raider C.S.S. ALABAMA was property of the United States

because it was never abandoned).[14] In Steinmetz, the court distinguished private property from property of the United States, which can only be abandoned as authorized by Congress. Id., 973 F.2d at 223 (internal citations omitted). As in Steinmetz, because the United States has not affirmatively abandoned the wreck of the lightship NANTUCKET (LV-117), the law of finds is completely inapplicable on these facts. Id., 973 F.2d. at 223. Because the bell and other items taken from the Lightship NANTUCKET (LV-117) were never abandoned and remain the property of the United States, it will certainly prevail on the merits. See also, International Aircraft Recovery, surpa, 218 F.3d 1255 (11th Cir. 2000).

(4) The Public Interest.

Granting the requested relief is not adverse to the public interest. Renee International Trading Corp., 888 F.2d at 220. Issuing the requested Preliminary Injunction under Rule 65(a), and the Temporary Restraining Order under Rule 65(b) will undoubtedly *further* the public interest. See, e.g., Talbot v Seeman, 5 U.S. 1, 1 Cranch 1 (Mem), (1801) (no claim can be maintained in a court of justice which is founded on act that is tortious). Because the Defendants stole artifacts from the wreck and grave site of the Lightship NANTUCKET (LV-117) – after the Coast Guard specifically instructed Takakjian to stay away – it is unquestionably in the public interest for those stolen goods to be returned to their rightful owner, the U.S. Coast Guard. For 200 years it has been the public interest **not**

---

[14] In that case, as in this one, parties taking Federal property without authorization were represented by Mr. Peter Hess.

to reward theft. Talbot v. Seeman, 5 U.S. at *19 ("The taking being unlawful can support no claim of salvage.").

At issue is the ability of the United States to retain control over and title to historical artifacts that Defendants *improperly removed* from its possession. The right of the sovereign United States to maintain Federal property that has never been abandoned and to preserve the sanctity of a maritime grave site is at stake. Put another way, should a private party – having been expressly forbidden to dive on a sunken vessel of the United States – be allowed to nonetheless raid that vessel and keep the loot? It is beyond reason to argue that the public interest could ever be served by allowing Federal property to wind up in private hands through a process commenced by an unauthorized removal of that property from a Federal grave site in the first place. It takes no citation to support this obvious conclusion.

To ensure the public interest in safeguarding Federal property and in preserving the grave site of fallen heroes, the United States also seeks a Temporary Restraining Order and an Injunction precluding Defendants from undertaking any further dives on the Lightship NANTUCKET (LV-117).

## CONCLUSION

For the above reasons, this Honorable Court should issue a Preliminary Injunction and a Temporary Restraining Order, applying Fed. R. Civ. P. 65(a) and 65(b) and its inherent powers. The Defendants should be required to deposit the artifacts unlawfully taken from the Lightship NANTUCKET (LV-117) with the Court or to return them to the Coast Guard,

pending determination on the merits. Without that requested relief, any decision on the merits may well be meaningless, given Defendants' course of dealing with the U.S. Coast Guard. To prevent recurring litigation, the United States also seeks an Order precluding the Defendants from making further dives on the lightship NANTUCKET (LV-117).

February 28, 2005

                        Respectfully submitted,

                        PETER D. KEISLER
                        Assistant Attorney General

                        MICHAEL J. SULLIVAN
                        United States Attorney

                        BARBARA HEALY SMITH
                        Assistant United States Attorney
                        District of Massachusetts
                        United States Courthouse, Suite 9200
                        1 Courthouse Way
                        Boston, MA  02210

                        _/s/ Matthew J. Glomb_
                        MATTHEW J. GLOMB
                        Admiralty Trial Attorney, Civil Division
                        U.S. Department of Justice
                        P.O. Box 14271
                        Washington, D.C. 20044-4271
                        Telephone:  (202) 616-4035 (Glomb)
                        Facsimile:  (202) 616-4159

                        Attorneys for the Plaintiff United States