IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

IN ADMIRALTY

| | |
|---|---|
| The United States of America, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>ERIK J. TAKAKJIAN, STEVE GATTO, TOM PACKER, )<br>TOM MURRAY, DAVE MORTON, STEVE SCHEUER, )<br>and the BOSTON SEA ROVERS, *in personam*, and the )<br>RESEARCH VESSEL (R/V) QUEST, her engines, )<br>anchors, tackle, and appurtenances, etc., *in rem*, )<br>)<br>Defendants. )<br>) | Civil Action No.<br>05-cv-<br><br>05cv 10397 RWZ |

## DECLARATION OF CDR STEVEN M. STANCLLIFF, USCG

I, Steven M. Stancliff, hereby declare as follows:

1. I am a Commander in the United States Coast Guard, a component of the Department of Homeland Security.

2. I am assigned as a Judge Advocate within the Legal Office of the First Coast Guard District, 408 Atlantic Avenue, Boston, Massachusetts, 02110.

3. The NANTUCKET (LV-117) was built for and operated by the United States as a light vessel ("LV"). Her station was roughly 50 miles south of the Island of Nantucket and 200 miles east of New York City. On or about May 15, 1934 the NANTUCKET (LV 117) was rammed then sank with four of its crew still aboard. The U.S. Coast Guard was unable to retrieve their remains and considers the wreck a grave site.

4. The U.S. Coast Guard decommissioned the NANTUCKET (LV-117) but has has never abandoned the vessel. NANTUCKET (LV-117) remains property of the United States under the custody of the United States Coast Guard.

5. On March 1, 1999, Erik Takakjian contacted the Board of Underwater Archeological Resources (BUAR) for the Commonwealth of Massachusetts with respect to Takakjian's interest in retrieving items from the NANTUCKET (LV-117). BUAR documented that discussion with a letter to Takakjian expressly noting that NANTUCKET (LV-117) was federal property under the control of the U.S. Coast Guard. BUAR specifically advised Takakjian that such a project could be undertaken:

- only with the consent and cooperation of the United States Coast Guard;
- that all recovered materials will remain the property of the Coast Guard; and
- and that all recovered material would be turned over to the Coast Guard.

BUAR informed the Coast Guard of Takakjian's request by sending copies of its letter to the Coast Guard Historian, Robert Browning, and the curator of the Coast Guard Museum, Cindee Herrick. (*See*, Exhibit A).

6. Within days of his conversation with the Massachusetts BUAR, Takakjian wrote to the U.S. Coast Guard's Chief Counsel on March 5, 1999, with copies to historian Robert Browning and curator Cindee Herrick. Takakjian explained that he had located the wreck of NANTUCKET (LV-117). He *requested permission* to "recover the ship's fog bell, conserve, and stabilize it" and deliver it to the Coast Guard Museum on the grounds of the U.S. Coast Guard Academy in New London, Connecticut. Takakjian concluded his

2

request by stating, "I await the approval of your office, Mr. Browning and Ms. Herrick before proceeding further with this project." (*See*, Exhibit B).

7. The following month, by direction of the Commandant of the Coast Guard, the Acting Chief of the Coast Guard's Office of Environmental Law wrote back to Takakjian to inform him that:

- the Coast Guard's Office of Financial Management, as custodian of the decommissioned vessel, would decide the matter;
- the remains of crew members of the NANTUCKET (LV-117) are believed to still be aboard the vessel; and
- historical preservation issues were involved; so,
- Federal law required the Coast Guard to engage in multi-agency coordination before reaching a decision on Takakjian's request; but,
- Takakjian could expedite the review process by submitting evidence of his professional expertise and details of his salvage plan.

(*See*, Exhibit C). That response also identified specific points of contact at the Office of Financial Management for Takakjian and invited him to contact the Coast Guard's legal staff if he had further questions. (Id.)

8. The Coast Guard's Office of Financial Management did not receive further information or inquiry from defendant Takakjian. By direction of the Commandant, the Chief of the Coast Guard's Asset Management Division answered Takakjian's request on June 28, 1999. That response:

3

- referred directly to Takakjian's request of March 5, 1999;
- confirmed that the U.S. Coast Guard is the owner and custodian of the NANTUCKET (LV-117);
- confirmed that under Federal criteria for historic property, significant consultation and evaluation would be required prior to going forward;
- because the shipwreck is a gravesite, there were significant issues of privacy;
- and as a result, the U.S. Coast Guard informed Takakjian, "you may not undertake any activities involving the NANTUCKET."

(*See*, Exhibit D). Although that denial letter provided Takakjian a point of contact, he did not disagree with, complain about, or appeal the decision rendered on June 28, 1999.

9. In September 2004, the founder of the USCG Lightship Sailors Association, Inc. alerted the Coast Guard that Boston Sea Rovers had removed artifacts from the NANTUCKET (LV-117), stating: "Projects like this should never happen. From a very personal standpoint, these people are desecrating a grave site of my brother Lightship Sailors who died with honor." He forwarded a press release from the Boston Sea Rovers, claiming to have taken the following items from the NANTUCKET (LV-117):

- the ship's bell
- its helm
- its engine order telegraph
- its binnacle
- its signal light; and

4

- several portholes

(*See*, Exhibit E).  The Boston Sea Rover's press release discusses how defendants Takakjian, Gatto, Packer, Murray, Morton and Scheuer used force "to finally break the bell and it's (sic) support legs free from the wreckage" and how they cut off the bell's support structure to make it easier to bring aboard R/V QUEST.  (Id.).  The press release made no mention of returning that Federal property to the United States, but instead boasted about placing it on public display.  (Id.).

10.   Once informed that Erik Takakjian had ignored the Coast Guard's instructions to refrain from undertaking any activities involving the NANTUCKET (LV-117), Coast Guard investigators contacted Takakjian.

11.   Erik Takakjian admitted that he had received the Coast Guard's denial of his request to dive on the NANTUCKET (LV-117) to retrieve its bell.  He further admitted that in addition to those items listed in ¶ 9, he had removed the Lightship's main lantern and a clock case.

12.   While Erik Takakjian stated he intended to put the items taken from NANTUCKET (LV-117) on public display, he maintained the ship's bell and compass binnacle on his own property.  Takakjian also transferred the ship's light assembly, helm, and engine order telegraph to fellow members of the Boston Sea Rovers – Mr. Packer and Mr. Gatto – who live in New Jersey.

13.   On November 23, 2004, Erik Takakjian told Coast Guard investigators that he and his colleagues would return the property taken from NANTUCKET (LV-117).

Having received Takakjian's pledge to promptly return that property, the United States Attorney for the District of Massachusetts declined to prosecute Takakjian for "stealing federal government property." (*See*, Exhibit F).

14. However, rather than returning the NANTUCKET (LV-117) artifacts, Erik Takakjian and his colleagues engaged counsel and purported to set terms by which they would return the items taken from NANTUCKET (LV-117). Their terms are completely unacceptable to the Coast Guard. Takakjian and his colleagues also seek a "liberal salvage award" for the items taken – without authority – from the NANTUCKET (LV-117).

15. The items that Erik Takakjian and his colleagues removed from the NANTUCKET (LV-117) have a commercial value worth tens of thousands of dollars.

I verify under penalty of perjury, in accordance with 28 U.S.C. § 1746, that the foregoing is true and correct. Executed this 24th day of February, 2005 in Boston, MA.

STEVEN M. STANCLIFF
Commander, U.S. Coast Guard

6